IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION


United States of America,        )
                                 )
          vs.                    )  3:20cr00087
                                 )
Matthew J. Ward,                 )
                                 )
              Defendant.         )
_____)  September 23, 2020


TRANSCRIPT OF PRELIMINARY AND DETENTION HEARINGS

BEFORE THE HONORABLE KEVIN F. MCDONALD
United States Magistrate Judge, presiding


A P P E A R A N C E S:

For Government:              Brandon Hinton, Esquire
                             US Attorneys Office
                             55 Beattie Place, Suite 700
                             Greenville, SC 29601


For Defendant:               Lawrence W. Crane, Esquire
                             101 Whitsett Street
                             Greenville, SC 29601




Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
300 E. Washington Street, Room 304
Greenville, S.C. 29601


Proceedings recorded by stenomask, transcript produced by
computer-aided transcription.

1          <u>P R O C E E D I N G S</u>

2      (Proceedings begins at 10:44 a.m.)

3          **THE COURT:** All right.

4          Yes, ma'am.

5          **MS. HINTON:** May it please the Court, Your Honor. The

6  next matter before you is United States of America versus

7  Matthew J. Ward, 3:20mj87. We are here for Mr. Ward's

8  preliminary hearing and detention hearing. He is present with

9  his attorney Larry Crane.

10         **THE COURT:** Okay.

11         Mr. Crane, good to see you. I appreciate you helping

12  Mr. Ward in this case.

13         **MR. CRANE:** Thank you. Thank you, Judge.

14         **THE COURT:** All right.

15         I had set this for a preliminary hearing and a

16  detention hearing. Would you like to go forward with those

17  hearings today?

18         **MR. CRANE:** Yes, sir, Judge.

19         **THE COURT:** Okay.

20         Very good.

21         All right.

22         We'll do it by way of testimony, so I ask the U.S.

23  attorney to call your first witness.

24         **MS. HINTON:** Thank you, Your Honor.

25         We would call Special Agent Rosalie Herberger.

Rosalie Herberger - Direct Examination by Ms. Hinton                    3

1          **THE CLERK:**  Please stand right there on the corner.

2    Place your left hand on the Bible and please raise your right

3    hand. Please state your name for the record.

4          **THE WITNESS:**  Rosalie Herberger.

5                      **ROSALIE HERBERGER**

6        having first being duly sworn, testified as follows:

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Thank you.

9          **THE COURT:**  All right.

10        Okay.

11        If you'll just speak right into the microphone and

12    answer any questions of counsel.

13                      **DIRECT EXAMINATION**

14   **BY MS. HINTON:**

15   **Q**    Special Agent Herberger, where are you employed?

16   **A**    I'm employed by the Bureau of Alcohol, Tobacco, Firearms

17   and Explosives.

18   **Q**    And are you a special agent with ATF?

19   **A**    I am.

20   **Q**    How long have you been employed there?

21   **A**    I've been employed approximately six years.

22   **Q**    And as part of your employment, did you start an

23   investigation into Matthew Ward and others?

24   **A**    I did.

25   **Q**    How long has that investigation been going?

Rosalie Herberger - Direct Examination by Ms. Hinton                    4

1   **A**    The investigation's been going on approximately two years.

2   **Q**    And did you identify Matthew Ward and others as part of a

3   division of Folk Nation?

4   **A**    I did.

5   **Q**    And what division of Folk Nation are they associated with?

6   **A**    They're associated with the Gangster Disciples.

7   **Q**   Okay.

8       Can you give the Court a brief background of what the

9   Gangster Disciples are within South Carolina?

10  **A**    So the Gangster Disciples is known as a gang, which is

11  typically a group of three or more people work for a group that

12  they either commit criminal acts on or on behalf of to further

13  that gang.

14  **Q**   Okay.

15      And have you, through your investigation, identified

16  whether or not the Gangster Disciples are a violent gang?

17  **A**    We have.

18  **Q**    Okay.

19      And can you tell the Court a little bit about the violence

20  within that gang?

21  **A**    We've -- we've determined through the investigation that

22  the Gangster Disciples or members of the Gangster Disciples and

23  associates of the Gangster -- Gangster Disciples have been

24  involved in violent beatings, murders, and drive-by shootings

25  on behalf of the gang.

Rosalie Herberger - Direct Examination by Ms. Hinton                    5

1    **Q**    And are many of the higher ranking members of the Gangster

2    Disciples incarcerated?

3    **A**    They are.

4    **Q**    And are many of them incarcerated within the Department of

5    Corrections?

6    **A**    They are.

7    **Q**    How does this gang get their money?

8    **A**    So the gang -- the -- the gang furthers itself through the

9    use of firearms and drug trafficking -- through individual --

10   and they use individuals who are not currently incarcerated to

11   do their business.

12   **Q**    Okay.

13          So is it orchestrated within the Department of Corrections

14   based on your investigation?

15   **A**    It is.

16   **Q**    And then -- is it -- based on your investigation, do they

17   contact people on the outside?

18   **A**    They do. They contact people via Facebook messenger, cell

19   phone, text messages. And typically, they ask them and coerce

20   them to go ahead and pick up drugs for them and drop off drugs

21   to specific people. And in turn, they'll either pay them or

22   they'll pay utility blues -- utility -- utility bills or help

23   offer other assistance on their behalf.

24   **Q**    And the violence that you spoke of, the murders and the

25   beatings, are those directly -- based on your investigation,

Rosalie Herberger - Direct Examination by Ms. Hinton                6

1   directly related to the drug trade?

2   **A**    They are.

3   **Q**    Is Mr. Matthew Ward a member of the Gangster Disciples?

4   **A**    He is.

5   **Q**    And can you tell the Court a little bit about Mr. Ward's

6   involvement in this conspiracy that we are here on today.

7   **A**    So we have learned early in the investigation that

8   Mr. Ward was the drug distributor for the Columbia/Lexington

9   area. And he would contact certain individuals in that area to

10  direct them to pick up narcotics on his behalf or drop off

11  firearms on his behalf.

12  **Q**    And through your investigation, did ATF and Lexington

13  County utilize a confidential informant to coordinate some buys

14  with Mr. Ward?

15  **A**    We did.

16  **Q**    All right.

17       Let's go through those buys. On June 13, 2019, can you

18  tell the Court what happened that day?

19  **A**    Yes, ma'am.

20  **Q**    On June 13, 2019, an ATF CI coordinated the purchase of

21  approximately three ounces of methamphetamine from Ward and a

22  co-conspirator in the case, Bryant Bruce, over Facebook

23  messenger. After setting up the control buy and the CI

24  purchased approximately 80.58 grams of methamphetamine.

25  **Q**    Okay.

1          And was that buy audio and video recorded?

2    **A**    It was.

3    **Q**    And so did the CI in that case discuss purchasing

4    methamphetamine directly from Mr. Ward.

5    **A**    Yes. After he was debriefed, he had told the law

6    enforcement officer that Mr. Ward had set up the purchase from

7    Brian Bruce for him.

8    **Q**    Okay.

9          And in fact, based on your investigation, does Mr. Ward

10   have a Facebook account?

11   **A**    He did. Correct. He has deleted it since, now.

12   **Q**    Okay.

13         And based on your investigation did Mr. Ward and others

14   often use Facebook messenger and contraband cell phones to

15   communicate with people on the outside?

16   **A**    They did.

17   **Q**    All right.

18         And tell us about a purchase on June 13, 2019, from Amber

19   Hoffman.

20   **A**    On June 13, 2019, an AT C -- an ATF CI purchased

21   approximately 54.44 grams of methamphetamine from another

22   co-conspirator in the case, Amber Hoffman, for approximately

23   $450. Through different sources's statements that we received,

24   whether it be proffer statements or interviews, we had learned

25   that Mr. Ward was one of Ms. Hoffman's main suppliers for

Rosalie Herberger - Direct Examination by Ms. Hinton                          8

1    methamphetamine.

2    **Q**    Okay.

3         So based on your investigation and knowledge of this case,

4    do you believe that that methamphetamine came from Mr. Ward?

5    **A**    I do.

6    **Q**    All right.

7         Can you tell the Court about June 26, 2019?

8    **A**    On June 26, 2019, Mr. Ward had called an ATF CI and had

9    asked him to bond Ms. Hoffman out of jail on state charges.

10   After the CI bonded Hoffman out, Ward told the CI that he had a

11   stub nose 360 -- 357 and a quantity of heroin for him as

12   payment for bonding Hoffman out. The CI met with us ATF agents

13   who we searched him for contraband and then we wired him up.

14   The CI, then, picked up Ms. Hoffman who directed him to 1419

15   Mack Street, which is in Gaston, South Carolina.

16        When they arrived, Ms. Hoffman went -- got out of the

17   vehicle and went inside and returned. She drove -- she came

18   back to the vehicle. And then, the CI then -- and Ms. Hoffman

19   then drove to 155 Claire Road, Gaston, South Carolina. When

20   they arrived, Ms. Hoffman exited the vehicle and went into the

21   house. She came back and gave the CI a Taurus 350 -- nine

22   caliber firearm.

23        Ms. Hoffman told the CI that she received approximately

24   seven grams of heroin for herself and approximately seven grams

25   for the CI from Mr. John Johnson, another co-conspirator in the

Rosalie Herberger - Direct Examination by Ms. Hinton                    9

1    case. Mr. Johnson lived at 1421 Mack Street. Ms. Hoffman told

2    the CI that Samuel Dexter Judy was at 125 Claire Road, which

3    was Ms. Hoffman's brother house, and that Hoffman had

4    previously told the CI that Johnson would provide the heroin

5    and Judy would provide the firearm.

6         After that had -- after that incident occurred, our CI had

7    went back and talked to Mr. Judy. And Mr. Judy had told the

8    source that he needed to firearm back because it had belonged

9    to a member of one of the outlaw motorcycle gangs.

10   **Q**    Okay.

11        And how long after Mr. -- after the CI bonded Ms. Hoffman

12   out on Mr. Ward's -- at Mr. Ward's direction did this incident

13   take place? Was it the same day?

14   **A**    It was on the same day.

15   **Q**    Can you tell the Court what happened on July 3, 2019?

16   **A**    On July 3, 2019, our ATF CI reached out to Mr. Ward to

17   arrange the purchase of two ounces of methamphetamine. Shortly

18   thereafter, Mr. Judy had contacted the CI, to complete the

19   purchase. We gave the CI $600. The CI, then, drove to 1236

20   Fallaw Road to meet Judy who was in a vehicle outside the

21   address and remained in the vehicle ---

22             **MR. CRANE:**  Your Honor --

23             **THE WITNESS:**  --- during the ---

24             **MR. CRANE:**  Judge --

25             **THE WITNESS:**  --- transaction.

1           **MR. CRANE:**  May it please the Court?

2           **THE COURT:**  Yes, sir.

3           **MR. CRANE:**  We're not at a horse race. I can't

4    understand. She's speaking so fast.

5           **THE COURT:**  I understand.

6           If you would slow down.

7           **THE WITNESS:**  Yes, sir.

8           **THE COURT:**  Just carefully go over your testimony.

9           **MR. CRANE:**  She's obviously not from the South.

10          **THE COURT:**  Just carefully go over your testimony.

11   All right?

12          **THE WITNESS:**  Okay.

13          So --

14          **MR. CRANE:**  Something happen on July 3 and, you

15   know --

16          **THE COURT:** If you start over start on July 3.

17          **MR. CRANE:**  Thank you, Judge.

18          **THE WITNESS:**  So on July 3, an ATF CI had reached

19   out --

20          **THE COURT:**  Okay.

21          Hang on. Slow down. I know that -- I know that you

22   prepared this -- helped prepare this affidavit.

23          **THE WITNESS:**  Yes.

24          **THE COURT:**  And it seems to me that you're reading

25   some of this, and that's fine. That is absolutely appropriate.

Rosalie Herberger - Direct Examination by Ms. Hinton                    11

1    But if you read or however you testify, just slow down because

2    not only is the court reporter taking notes, but myself and

3    others in the courtroom are taking notes.

4              **THE WITNESS:**  Yes, sir.

5              **THE COURT:**  While you're very familiar with the

6    facts, none of -- none of us may be.

7              **THE WITNESS:**  Yes, sir.

8              **THE COURT:**  So I want you to testify and make sure

9    that we all hear.

10             **THE WITNESS:**  Absolutely.

11             **THE COURT:**  Okay.

12             Thank you.

13             **THE WITNESS:**  On July 3, 2019 --

14             **THE COURT:**  Hold on just a minute.

15             **THE WITNESS:**  Yeah.

16             **THE COURT:**  Anything further, Mr. Crane? Anything

17   further?

18             **MR. CRANE:**  No, sir. Thank you.

19             **THE COURT:**  Okay.

20             All right.

21             **THE WITNESS:**  -- an ATF CI had reached out to

22   Mr. Ward to arrange the purchase of two ounces of

23   methamphetamine.

24   **BY MS. HINTON:**

25   **Q**    All right.

Rosalie Herberger - Direct Examination by Ms. Hinton                    12

1      And let me ask you about that real quick. Did the -- did

2 the ATF CI actually speak to Mr. Ward on that day?

3 **A**    Yes.

4 **Q**    Okay.

5      And then after the ATF CI spoke to Mr. Ward, did Mr. Judy

6 contact him?

7 **A**    Correct.

8 **Q**    Okay.

9      And tell the Court about the contact from Mr. Judy?

10 **A**    So Mr. Judy had contacted the CI to complete the purchase.

11 We had met up with the CIA and gave the CI $600 in ATF funds.

12 The CI then drove to 1236 Fallaw Road and met with Mr. Judy who

13 was in the vehicle outside of the address and remained in the

14 vehicle during the transaction. The CI exchanged $600 for

15 approximately 58 grams of methamphetamine.

16 **Q**    And before we go to the next one, when you're giving out

17 these weights of methamphetamine, have these -- have drug labs

18 been completed on --

19 **A**    They have.

20 **Q**    So these -- the amounts that you are providing to the

21 Court, are those from the lab reports?

22 **A**    They are.

23 **Q**    All right.

24      Can you tell the Court what happened on July 19, 2019?

25 **A**    On July 19, 2008 -- 19, an ATF CI had purchased

Rosalie Herberger - Direct Examination by Ms. Hinton                    13

1    approximately 109.49 grams of methamphetamine from Rebecca

2    Martinez, who we knew to be Mr. Ward's girlfriend at that time.

3  **Q**    Okay.

4        And did the ATF CI on July 22, 2019, purchase roughly

5    105 grams of methamphetamine from Ms. Martinez?

6  **A**    They did. And during that purchase -- that buy was audio

7    and video recorded. During the purchase, Mr. Ward was on the

8    phone on speakerphone. That purchase was supposed to initially

9    happen at a place called Bozes Bar. And at Ms. Martinez's

10   request, it was changed -- or I'm sorry, it was changed because

11   it was originally supposed to happen at McDonald's. Mr. Bones

12   is heard on speakerphone and the CI knows that is Mr. Ward

13   because he has talked to him previously. And Mr. Ward tells the

14   CI --

15              **THE COURT:**  Hold on. Hold on. I lost you there.

16              **THE WITNESS:**  Yes, sir.

17              **THE COURT:**  Go over that again please.

18              **THE WITNESS:**  So the -- the buy was completed at

19   Bozes Bar in Lexington. The initial buy was supposed to be

20   completed at a McDonald's in Lexington. And at Ms. Martinez's

21   request, the buy had been switched to occur at Bozes. During

22   the purchase, Mr. Ward is heard on speakerphone. And he had --

23   says to the CI, "Man, I never trust McDonald's." And the CI

24   recognizes Mr. Ward's voice because he has talked to him

25   several other occasions before this.

1           **THE COURT:**  Okay.

2    **BY MS. HINTON:**

3    **Q**    All right.

4         And then, on July 24, 2019, did an ATF CI buy

5    approximately 148 grams of methamphetamine from Ms. Martinez?

6    **A**    Correct.

7    **Q**    Okay.

8         And I know you said that Mr. Martinez is -- was Mr. Ward's

9    girlfriend at that time, and we talked about Mr. Ward being on

10   speakerphone on the July 22 buy, what, if any, other

11   information do you have that connects Mr. Martinez to moving

12   methamphetamine for Mr. Ward?

13   **A**    We have a proffer from an individual that has stated that

14   Ms. Martinez had moved large quantities of methamphetamine on

15   behalf of Mr. Ward.

16   **Q**    Okay.

17        On August 5, 2019, can you tell the Court about the

18   undercover buy from Cynthia Rooks?

19   **A**    On August 5, 2019, an ATF confidential informant and an

20   ATF undercover agent went to Ms. Rook's house on Jakes Landing

21   and purchased approximately 302 grams of methamphetamine from

22   Rick's -- from Ms. Rooks on Ward's behalf.

23   **Q**    Okay.

24        And can you tell the Court what information we have

25   through your investigation that connects Ms. Rooks to Mr. Ward?

Rosalie Herberger - Direct Examination by Ms. Hinton                    15

1    **A**    So we had been told through the investigation that

2    Ms. Rooks was moving the -- the methamphetamine from Mr. Ward

3    and that she had taken over the drug trafficking business

4    because Mr. Ward did not want Ms. Martinez involved in the drug

5    trafficking business anymore because it was too dangerous.

6    **Q**    Okay.

7         And on August 19, 2019, did an ATF CI purchase

8    methamphetamine and a firearm from Mr. Rooks -- Ms. Rooks and

9    Mr. Richard Ford?

10   **A**    Yes. And during that purchase specifically, Mr. Ward is

11   again heard on the speakerphone. Ms. Rooks acknowledges

12   Mr. Ward because she says, "Bones, Bones, how much do you --

13   how much do I get for the gun? How much do I get for the ice?"

14   And at which point, Mr. Ward responds, "500 for the ice; 500

15   for the gun."

16        Mr. Ward further tells them to go next door and get a --

17   retrieve a camouflage Steyr rifle and take it give back to the

18   storage unit. During that buy, Ms. Ford [verbatim] and

19   Ms. Rooks traveled to a storage unit where they obtained the

20   firearm that they later sell to our CI. And they drop the

21   camouflage rifle in the storage unit.

22   **Q**    Okay.

23        And what evidence do we have that Mr. Ward's nickname is

24   "Bones"?

25   **A**    We've -- from cooperating statements and proffer

1    agreements, we've been told that he goes by "Bones." Mr. Ward

2    also has a tattoo on his arm that says "Bones."

3    **Q**    Can you tell the Court about the August 22, 2019, search

4    warrant at Ms. Rooks's residence?

5    **A**    On August 22, 2000 -- 22, 2019, we included a search

6    warrant at Ms. Rooks's residence located on Jakes Landing

7    resident -- and the storage unit, which was storage unit 59.

8    **Q**    And is that the same storage unit that, three days prior,

9    ATF observed Ms. Rooks and Mr. Ford going to?

10   **A**    That is.

11   **Q**    And is that the same storage unit that, according to the

12   CI and then the undercover -- or excuse me, the CI, Mr. Ward

13   directed them to go to?

14   **A**    Correct.

15   **Q**    Okay.

16   **A**    So during the search of the storage unit, and it led to a

17   seizure of approximately three kilograms of meth and nine

18   firearms, the CI had -- our CI on that night had previously

19   taken possession of an additional kilogram of ice at Mr. Ward's

20   request and brought it back to us.

21   **Q**    Okay.

22       Tell the Court a little bit more about the CI obtaining

23   one kilogram of methamphetamine prior to that search warrant on

24   the storage unit?

25   **A**    So a co-defendant earlier that night, Mr. Dexter Judy, had

1    taken off and fled from the police in Lexington County. At that

2    point, Mr. Ward had contacted our CI and told him he needed his

3    help. He needed him to go and pick up a black bag from Cindy's

4    -- Ms. Cindy's house. Mr. --

5    Q    And is that Ms. Rooks?

6    A    That is.

7    Q    All right.

8    A    At our direction, the ATF CI went over to Ms. Rooks's

9    house. And at that point, a black bag was put in his

10   passenger's seat, which he had brought back to myself and other

11   law enforcement. In that black bag, that was approximately one

12   kilogram of ice.

13        At that point, we had taken possession of the ice and we

14   had obtained a search warrant for the residence and obtained a

15   federal search warrant for the storage unit later the same

16   morning.

17   Q    Have you received multiple cooperator statements and

18   proffers regarding Mr. Ward?

19   A    Yes.

20   Q    How many?

21   A    We have approximately eight cooperating defendants against

22   Mr. Ward.

23   Q    And based on those cooperator statements, in 2019, how

24   many kilograms of methamphetamine can be attributed to

25   Mr. Ward?

Rosalie Herberger - Direct Examination by Ms. Hinton                18

1   **A**    At least 49 kilograms.

2   **Q**    And how many firearms?

3   **A**    The nine firearms in the storage unit.

4   **Q**    Okay.

5         And that is over a one-year period; is that correct?

6   **A**    Correct.

7   **Q**    Total from this group, this conspiracy, how many firearms

8   have been seized?

9   **A**    In the case collaboratively, we have 116 firearms that are

10  purchased or seized.

11  **Q**    And where does Mr. Ward fall in this conspiracy?

12  **A**    Mr. Ward falls as the main target in our conspiracy.

13  **Q**    Okay.

14        Is he the top?

15  **A**    He is the top.

16  **Q**    Does he call the shots?

17  **A**    He does.

18  **Q**    Based on your training, experience, and investigation, did

19  anything happen in this conspiracy without Mr. Ward's

20  direction?

21  **A**    No.

22  **Q**    Was Mr. Ward's cell tossed, for lack of a better term, on

23  August 23, 2019, based on this investigation?

24  **A**    Yes. On August 23, 2019, SCDC conducted an operation and

25  they tossed Mr. Ward's cell. At that time they tossed

Rosalie Herberger - Direct Examination by Ms. Hinton                    19

1    Mr. Ward's cell, when they went in there, they found him on the

2    cell phone that -- and the cell phone is connected to the phone

3    number which was communicating with our CI that night.

4              **THE COURT:**  When you say -- you say they "tossed" it?

5              **THE WITNESS:**  Yes, sir. They went there and they

6    conducted an operation to clean on the cell and sure it wasn't

7    full of contraband.

8              **THE COURT:**  I see.

9    **BY MS. HINTON:**

10   **Q**    But did they actually, when they went in -- I guess they

11   didn't even really have to toss it, did they physically observe

12   Mr. Ward on that cell phone?

13   **A**    Correct. It was in his hand.

14   **Q**    And just to be clear, that cell phone, the phone number,

15   is the number that the CI was contacting Mr. Ward on?

16   **A**    That is correct.

17   **Q**    Are you familiar with Mr. Ward being arrested on

18   September 16 ---

19   **A**    I am.

20   **Q**    --- of this year?

21   **A**    Yes.

22   **Q**    And was he transported up to Spartanburg County at that

23   time?

24   **A**    He was.

25   **Q**    And who was he transported by?

1    **A**    He was transported by an FBI TFO Joe Parrish and an ATF --

2    or I'm sorry, FBI Special Agent Dave Whitlock.

3    **Q**    And prior to them transporting him, did they advise him of

4    his Miranda rights?

5    **A**    He did, and he waived.

6    **Q**    All right.

7          Did Mr. Ward explain to the FBI that he was, in fact, a

8    member of Folk Nation?

9    **A**    He did.

10   **Q**    And what did he say that his rank was within that gang?

11   **A**    Mr. Ward stated that he was a low-level Folk Nation

12   member.

13   **Q**    Okay.

14         And based on your training and investigation; is that

15   true?

16   **A**    It is not.

17   **Q**    All right.

18         Based on your training and experience and investigation

19   into this gang, who moves -- sorry, who coordinates the

20   movement of methamphetamine within the gang?

21   **A**    Mr. Ward.

22   **Q**    Okay.

23         And in fairness to Mr. Ward, do other high-ranking members

24   of IGD also move methamphetamine?

25   **A**    Yes. There are several members who move it. And they are

1  specifically assigned to different locations. Mr. Ward's

2  location was the Columbia/Lexington area.

3  **Q**    And based on your investigation into this group, do low-

4  level members get to decide who buys methamphetamine?

5  **A**    They don't.

6  **Q**    Is all of the methamphetamine moved associated back to

7  these high-level members?

8  **A**    They are.

9  **Q**    Do any of these people on the outside related to this

10 conspiracy move methamphetamine without Mr. Ward's direction?

11 **A**    They do not.

12 **Q**    Okay.

13      In fact, did Mr. Ward admit to the FBI that he would

14 introduce people who wanted to sell methamphetamine?

15 **A**    He did.

16 **Q**    Okay.

17      Can you tell the Court what he said?

18 **A**    Mr. Ward stated that while he was in SCDC, that he would

19 introduce people who wanted to sell methamphetamine to people

20 who were holding weight. When you say "holding weight," he's

21 referencing people who are holding large amounts of

22 methamphetamine.

23           **THE COURT:**  Okay.

24           You need to explain this little bit clearer to me.

25           **THE WITNESS:**  Yes, sir.

Rosalie Herberger - Direct Examination by Ms. Hinton                    22

1          **THE COURT:**  Okay.

2          So he's in SCDC --

3          **THE WITNESS:**  So he's in SCDC and he's telling -- he

4    told our agents that he would introduce people --

5          **THE COURT:**  He told your agents --

6          **THE WITNESS:**  Yes, sir. The agents that transported

7    him that day ---

8          **THE COURT:**  Okay.

9          **THE WITNESS:**  --- Mr. Whitlock and Mr. Parrish, on

10   the way to the transport to Spartanburg.

11         **THE COURT:**  Okay.

12         **THE WITNESS:**  He said that he would introduce anyone

13   inside or people on the street who wanted to sell

14   methamphetamine to the plugs, to people who were holding larger

15   amounts of weight.

16         **THE COURT:**  Okay.

17   **BY MS. HINTON:**

18   **Q**    And just to be clear for the Court, the entire time that

19   you've been investigating this group, these two years, has

20   Mr. Ward been incarcerated?

21   **A**    He has.

22   **Q**    And the entire time, has he been at SCDC?

23   **A**    He has.

24   **Q**    You talked about beatings and murders with this group, is

25   there a beating that can be connected back to Mr. Ward within

1   this group?

2   **A**    Yes. Mr. Brian Bruce was severely beaten to the point that

3   at the -- when the initial call came in, it came in as a

4   gunshot wound, and he was beaten. And Mr. Ward, on the drive to

5   Spartanburg on the 16th, had admitted to sending Aaron Carrion

6   to collect money from Brian Bruce, and the money was for a drug

7   debt that had been owned to Mr. Ward by Brian Bruce. But he had

8   said that he didn't tell him to beat him up. He also said that

9   Mr. Carrion was just acting on behalf of pure loyalty to him.

10  **Q**    Okay.

11       But he did admit to sending Mr. Carrion to confront

12  Mr. Bruce who is a co-conspirator in this case ---

13  **A**    Correct.

14  **Q**    --- about owing him money for drugs?

15  **A**    Correct.

16  **Q**    All right.

17       Based on your source information, do you believe that

18  Mr. Ward sent Mr. Carrion to inflict violence on Mr. Bruce?

19  **A**    Yes. We've got several statements that said Carrion had

20  showed up on Bones' behalf -- and Mr. Ward's behalf, and

21  everyone knew it was because Bruce owed Bones money.

22  **Q**    And in that same transport, does Mr. Ward talk to the

23  agents about snitches within this conspiracy?

24  **A**    He does. Mr. Ward then mentions and talks to the people in

25  the conspiracy. And he says these people in the conspiracy who

Rosalie Herberger - Direct Examination by Ms. Hinton                24

1  must have snitched on him, they starting -- they would have to

2  stand in front of him in the courtroom. When advised that he

3  could be -- that could be constructed as a threat and it could

4  be -- add time to his sentence for saying that, he stated, "If

5  I'm looking at 20 to 30 years, what's another 10 to 20 years?"

6       He had also, additionally, had stated on a later occasion

7  that Matt Bowers who was a cooperating defendants at a trial

8  approximately two years ago wouldn't last five days for

9  testifying against "Lay Low" once he got out of federal prison.

10  Q    Okay.

11       And who was the person that he testified against?

12  A    Matt Bowers testified against Marcus Young AKA "Lay Low."

13  Q    All right.

14       And is that somebody that Mr. Ward is connected to?

15  A    As far as Mr. Ward saying he is.

16  Q    And in fact, in this larger conspiracy of Gangster

17  Disciples, has someone been murdered for snitching?

18  A    Yes.

19  Q    And did Mr. Ward admit to being connected to "G9" and "Man

20  Man"?

21  A    He did. He admitted to being connected to G9 and Man Man,

22  both of them.

23  Q    And can you tell the Court who "G9" and "Man Man" are?

24  A    So G9 and Man Man are a rank higher than Mr. Ward in the

25  Gangster Disciples. We were told that G9 specifically will call

Rosalie Herberger - Direct Examination by Ms. Hinton          25

1  the orders and he sets who -- who runs what -- what county,

2  whose selling dope in what county.

3  **Q**     And is "G9," Edward Akridge?

4  **A**     It is.

5  **Q**     And is "Man Man," James Peterson?

6  **A**     It is.

7  **Q**     And do both Mr. Akridge and Mr. Peterson currently have

8  pending state murder charges for murders that are alleged to

9  have occurred while they are in SCDC but that they orchestrated

10 from inside the SCDC?

11 **A**     Yes, they do.

12 **Q**     And are these two separate murders?

13 **A**     Yes.

14 **Q**     On that ride, did Mr. Ward also admit to his involvement

15 with the firearms?

16 **A**     Not on that ride. But at a later time, he had talked about

17 the firearms. And he acknowledged that the camouflage rifle was

18 a .45 caliber rifle. He acknowledged that one of rifles that

19 were seized from the storage unit was a fully automatic and had

20 asked how long it had taken to shoot that rifle. He had also

21 made the statement that if he knew 15 out of the 17 individuals

22 that were in the conspiracy were junkies, he wouldn't have

23 dealt with them.

24 **Q**     And does Mr. Ward have a prior record going back to around

25 2003, 2004?

Rosalie Herberger - Direct Examination by Ms. Hinton                26

1    **A**    He does.

2    **Q**    And does that include convictions for burglary first

3    degree?

4    **A**    Yes.

5    **Q**    And marijuana possession?

6    **A**    Correct.

7    **Q**    Burglary second degree?

8    **A**    Correct.

9    **Q**    CDV?

10   **A**    Yes.

11   **Q**    Possession with intent to distribute methamphetamine near

12   a school?

13   **A**    Correct.

14   **Q**    Several assault convictions?

15   **A**    Correct.

16   **Q**    Failure to stop for a blue light?

17   **A**    Yes.

18   **Q**    Resisting arrest?

19   **A**    Yes.

20   **Q**    Were you able to -- prior to coming to testify today, were

21   you able to review Mr. Ward's inmate history on the SCDC

22   website?

23   **A**    I was.

24   **Q**    How many violations does Mr. Ward have since he has been

25   incarcerated in SCDC?

Rosalie Herberger - Cross-Examination by Mr. Crane                    27

1    **A**    He's got 18 violations and those include assaulting

2    employees, possession of a weapon, and escape.

3    **Q**    And when is Mr. Ward set to -- his predicted release date

4    from SCDC?

5    **A**    November 24, 2020.

6    **Q**    Is there anything that I missed that the Court needs to

7    know about Mr. Ward?

8    **A**    No.

9    **Q**    All right.

10       That's all I have. Please answer anything Mr. Crane may

11   have.

12              **THE COURT:**    All right.

13                       **CROSS-EXAMINATION**

14   **BY MR. CRANE:**

15   **Q**    All right.

16       Agent, would you -- it's my understanding that the

17   information dates back -- that charges him with the conspiracy

18   back to, I believe, 2017?

19   **A**    That is when the conspiracy for the case had started.

20   Correct, sir.

21   **Q**    Can you tell me when your thoughts are that he may have

22   gotten involved with the conspiracy?

23   **A**    We believe sometime in 2019.

24   **Q**    Sometime in 2019.

25   **A**    Correct.

Rosalie Herberger - Cross-Examination by Mr. Crane                    28

1   Q    Do you know when -- what's your belief of the date?

2   A    We started purchasing from Mr. Ward in June 2019 due to --

3   we've got proffer statements that says he was involved before

4   that date. But we started purchasing actual methamphetamine

5   from Mr. Ward on the '19th.

6   Q    You said June?

7   A    June 2019.

8   Q    Okay.

9        I'm going to ask about -- and the gang that you said he is

10  a member of is what?

11  A    The Gangster Disciples.

12  Q    Say it again?

13  A    The Gangster Disciples.

14  Q    Okay.

15       Is that a gang only in South Carolina or is that a

16  national gang?

17  A    I -- I would have to do further research on that. I know

18  that the gang itself is in South Carolina. That's the -- that's

19  the gang -- the part of the gang that I had done my

20  investigation on.

21  Q    So you don't know if it's -- if there's a larger

22  organization other than --

23  A    I don't.

24  Q    Is there just one chapter of this gang in South Carolina?

25  A    So the Gangster Disciples is part of the Folk Nation. And

Rosalie Herberger - Cross-Examination by Mr. Crane                              29

1   the Folk Nation has multiple chapters.

2   **Q**    All right.

3        So Gangster Nation came from Folk Nation?

4   **A**    Correct.

5   **Q**    And Folk Nation has numerous chapters?

6   **A**    Correct.

7   **Q**    And you don't know about Gangster Nation?

8   **A**    Gangster Disciples.

9   **Q**    Gangster Disciples.

10  **A**    I know about the Gangster Disciples that I investigated in

11  South Carolina.

12  **Q**    All right.

13       And so is the top dog, in your opinion, of the Gangster

14  Disciples, Mr. Ward?

15  **A**    The top dog, in my opinion, in Columbia and South -- in

16  Columbia and the Lexington area is Mr. Ward, correct.

17  **Q**    How many other -- how many other groups are there in South

18  Carolina?

19  **A**    I don't know exactly how many groups there are within

20  South Carolina.

21  **Q**    All right.

22       So you're saying if, in fact, it's a chapter, then he --

23  you're saying he's the head of the chapter in Lexington,

24  Columbia?

25  **A**    Correct.

Rosalie Herberger - Cross-Examination by Mr. Crane                    30

1   Q    All right.

2        And they make their money how?

3   A    Through drug trafficking and firearm trafficking.

4   Q    And what happens to the money for someone that's been in

5   prison for 10 years? Where's that money going?

6   A    We have been told through cooperating defendants and other

7   sources that the money is sent to Mr. Ward and other

8   individuals through a green guard got [verbatim]. They put the

9   money on the Green Card. They scratch off the back of the card

10  and then they send pictures of that card to Mr. Ward with the

11  numbers that identify it.

12  Q    So he's got a Green Card with all of this money on it.

13  A    That's what we have been told, yes.

14  Q    Did you find any Green Card with all kinds of money on it?

15  A    No.

16  Q    And what can he do with a Green Card with a bunch of money

17  on it?

18  A    The Green Card's got money on -- it already has money

19  loaded to it. So from my investigation, the Green Card can be

20  loaded into a bank or is considered a bank itself.

21  Q    He can take from the Green Card and put it into a bank?

22  A    Correct.

23  Q    All right.

24       Have you found any bank that has money from him in it?

25  A    We have not.

Rosalie Herberger - Cross-Examination by Mr. Crane          31

1   **Q**    You ever found any Green Card with money from him?

2   **A**    No, sir.

3   **Q**    Do you have any direct evidence other than statements from

4   people who have already been arrested that he's got a Green

5   Card with money on it?

6   **A**    We don't.

7   **Q**    So you're banking on statements from cooperating

8   defendants, people that have been arrested for charges?

9   **A**    Yes.

10  **Q**    All right.

11       On June 13, 2019, you talked about a CI buy, I believe it

12  was. You used a CI; is that correct?

13  **A**    Correct.

14  **Q**    And tell me again who that CI bought from. Just briefly.

15  Don't read it off cause I can't understand what you're saying

16  anyway. But briefly, who did that CI buy from?

17  **A**    The CI purchased from Brian Bruce.

18  **Q**    From Brian Bruce?

19  **A**    Correct.

20  **Q**    Now, let me ask you this: How many CIs have you referenced

21  during your statements today?

22  **A**    We've got two CIs referenced during --

23  **Q**    Okay.

24       And one of them happened to be Zach something; is that

25  correct?

Rosalie Herberger - Cross-Examination by Mr. Crane                    32

1    **A**    Confidential source, sir.

2    **Q**    Well, I understand that. But you are testifying today. I

3    think we need to know who it is.

4            **MR. CRANE:**    Judge, I'd ask that you ask her to tell

5    who it is.

6            **THE COURT:**    That's overruled. I'm not going -- I'm

7    not going to require her to give the names of CIs at this stage

8    in the proceedings.

9            **MR. CRANE:**    Well, Judge, just so that you might know,

10   one of the reasons I asked, I was given discovery today.

11           **THE COURT:**    Yes, sir.

12           **MR. CRANE:**    Okay.

13           This right here -- this is my discovery.

14           **THE COURT:**    I understand, Mr. Crane. But this is not

15   a -- this is not a matter of discovery. This is a preliminary

16   and a detention hearing.

17           **MR. CRANE:**    I understand.

18           **THE COURT:**    So I'm not going to require her to

19   divulge --

20           **MR. CRANE:**    What I --

21           **THE COURT:**    -- to divulge information at this point

22   which is more appropriately divulged at a later point.

23           **MR. CRANE:**    Okay.

24           Well, I would ask you at this point, though, to

25   require the government to give me full discovery.

Rosalie Herberger - Cross-Examination by Mr. Crane                    33

1          **THE COURT:**  The government will comply with the

2     discovery rules in -- in -- in providing discovery.

3     **BY MR. CRANE:**

4     **Q**    All right.

5          So on June 19, from Brian your CI bought dope. And how did

6     you tie that to Mr. Ward?

7     **A**    After the CI had been debriefed, the CI had stated that

8     through Brian Bruce and Mr. Ward that the CI had -- that

9     Mr. Ward had directed Brian Bruce to sell methamphetamine to

10    the CI.

11    **Q**    Mr. Ward had directed Brian to sell to the CI?

12    **A**    Correct.

13    **Q**    What -- what -- what concrete evidence do you have of

14    that?

15    **A**    That he had shown Facebook messages from Mr. Ward

16    directing Mr. Bruce to sell to the CI.

17    **Q**    Do you have copies of those Facebook messages?

18    **A**    We do not.

19    **Q**    So -- so the government is not in possession of any

20    Facebook messages that Mr. Ward sent or allegedly sent on that

21    day; is that correct?

22    **A**    Not on that day, no.

23    **Q**    So you're taking the word of your CI as relayed to him by

24    Brian that Ward directed him to do that?

25    **A**    Correct.

1    **Q**    And you don't have any evidence of the Facebook messages?

2    **A**    Not for that buy, no.

3    **Q**    Okay.

4          And then on 6/13/19, you talked about Mr. Hoffman

5    [verbatim] being arrested, is that correct, or was bonded out?

6    **A**    We talked about the CI -- on June 13, we talked about the

7    CI purchasing methamphetamine from Ms. Hoffman.

8    **Q**    Okay.

9          So not only did he purchase from Brian, but from

10   Hoffman ---

11   **A**    Correct.

12   **Q**    --- on the same day?

13         All right.

14         And what do you have to tie Mr. Ward to that particular

15   purchase of narcotics?

16   **A**    We've learned through a cooperating defendants and

17   proffers that Mr. Ward was one of Ms. Hoffman's main suppliers.

18   **Q**    Do you have any concrete evidence other than statements

19   given by people who have been arrested in this conspiracy?

20   **A**    Not from Ms. Hoffman.

21   **Q**    All right.

22         So the only thing you have there are statements of other

23   people?

24   **A**    Correct.

25   **Q**    No cell phone records or Facebook posts or anything like

1  that?

2  **A**    Not for Ms. Hoffman, not right now.

3  **Q**    And then, I think she talked about July 3. Tell me what

4  happened there.

5  **A**    On July 3, an ATF CI had reached out to Mr. Ward via text

6  messages and -- to arrange the purchase of two ounces of

7  methamphetamine. Shortly thereafter, Mr. Judy had contacted the

8  CI and -- to say he was going to complete the purchase on

9  Mr. Ward's behalf. The agents gave the CI $600. The CI then

10  drove to 1236 Fallaw Road, met Mr. Judy and exchanged $600 for

11  approximately 58 grams.

12  **Q**    Okay.

13        Now, do you have any -- do you have copies of the text

14  messages that the CI allegedly sent to Mr. Ward?

15  **A**    I don't for that -- for that buy.

16  **Q**    All right.

17        So on that buy on July 3 -- and do you have any copies of

18  text messages that the person from whom the CI bought has

19  copies that Mr. Ward sent him?

20  **A**    I do not.

21  **Q**    Do you have any concrete evidence other than these

22  statements that tie Mr. Ward to that transaction on July 3?

23  **A**    We have learned that Mr. Ward had also communicated via

24  FaceTime with these individuals to conduct -- to conduct the

25  transactions.

1   **Q**   And who told you that?

2   **A**   Multiple sources and CIs.

3   **Q**   Okay.

4   Do you have any evidence that that actually occurred other

5 than statements from these multiple sources?

6   **A**   We've got text messages for other purchases from Mr. Ward

7 to sources to conduct the --

8   **Q**   All right.

9   So you have copies of text messages from Ward to some of

10 these people?

11   **A**   For other transactions, correct.

12   **Q**   Okay. All right.

13   Tell me which transactions you have copies of text

14 messages.

15   **A**   So on the June 26, 2019, incident where Mr. Ward asked our

16 CI to bond Ms. Hoffman out, we have text messages from Mr. Ward

17 to the CI where he tells him he's got a Snub Nose .357 for him.

18   **Q**   All right.

19   And so you got dollars copies from Ward to the CI?

20   **A**   Correct. We have copies of those messages.

21   **Q**   All right.

22   What other dates do you have copies of text messages?

23   And I -- let me -- that's the one where allegedly they

24 went to a house and found the 357, some dope and then the gun

25 was given to someone?

1   **A**    The gun was given to the CI. They went to another house to

2   get the heroin.

3   **Q**    Okay.

4   **A**    On the August 19, 2019, incident from the purchase of the

5   firearm and the ice from Ms. Rooks, we have text messages of

6   the firearms that we later located in the storage unit from

7   Mr. Ward to the CI.

8   **Q**    All right.

9        So again, copies of those text messages?

10  **A**    Correct.

11  **Q**    Okay.

12       From Ward to the CI regarding the firearms in the storage

13  area?

14  **A**    Yes. Correct.

15       On the purchase for the hundred -- 302 grams of

16  methamphetamine, we have copies of text messages from Ward to

17  the CI. And later the same evening, after we conduct that

18  purchase, Mr. Ward texts the CI and tell them not to ever bring

19  anybody back to his old lady's house.

20  **Q**    Okay.

21       What was that date?

22  **A**    That's going to be August 5, 2019, sir.

23  **Q**    Okay.

24       Do you have any other dates where you have actual copies

25  of text messages coming from Ward to anybody?

Rosalie Herberger - Cross-Examination by Mr. Crane                    38

1  **A**    No, sir.

2  **Q**    Okay.

3        Do you have any concrete evidence that Mr. Ward himself

4  has participated in violent activities as a member of this

5  gang?

6  **A**    We have been told by numerous sources that the beating on

7  Brian Bruce conducted was because money was owed to Bones as a

8  drug debt.

9  **Q**    I understand that. My question was: Do you have any

10  concrete evidence that Mr. Ward was involved in violent

11  offenses other than statements from people who have been

12  indicted in this case?

13  **A**    We don't.

14  **Q**    All right.

15        Do -- are -- are -- is the government aware of who beat up

16  this particular person?

17  **A**    We are aware of a couple of individuals who beat up this

18  person, yes.

19  **Q**    Okay.

20        Have any of those people said they did it at the direction

21  of Mr. Ward?

22  **A**    No.

23  **Q**    At one time, you testified earlier about a cell phone call

24  that allegedly Mr. Ward made to the confidential informant. Do

25  you have any concrete evidence that that occurred?

1   **A**    So on July 22, 2019, during the purchase of

2   methamphetamine of 105.36 grams, that was the purchase that

3   occurred at Bozes Bar and it was supposed to occur at

4   McDonald's. Mr. Ward is on speakerphone. He's heard through the

5   audio and video recording. That's when he says, "Man. I never

6   liked McDonald's." The CI recognizes Mr. Ward's voice because

7   he's talked to him before.

8      Furthermore, on the purchase of the firearm and the

9   methamphetamine on August 19, Mr. Ward is on speakerphone in

10   the house. And he tells Ms. Rooks when she asked, "Bones,

11   bones, how much do you want for the ice and the gun?" and he

12   says, "500 for the ice; 500 for the gun."

13   **Q**    Who is "Bones"?

14   **A**    Bones is Mr. Ward's nickname.

15   **Q**    Okay.

16      And you said that is on audiotape?

17   **A**    It is.

18   **Q**    So we can listen to that?

19   **A**    You could.

20   **Q**    Okay.

21      You mentioned something about the -- the trip back from

22   the Department of Corrections to Spartanburg?

23   **A**    Correct.

24   **Q**    And alleged statements that Mr. Ward made?

25   **A**    Correct.

Rosalie Herberger - Cross-Examination by Mr. Crane                    40

1    Q    Are any of those recorded?

2    A    I believe the conversation was recorded. I believe the

3    recorder might have died halfway through the conversation. But

4    at least the beginning of the conversation had been recorded

5    with Mr. Ward, yes.

6    Q    I couldn't understand you.

7    A    I'm sorry. The -- the conversation had been recorded. At

8    some point, I know the recorder or the battery had died on it.

9    I don't know at what point that had occurred.

10   Q    Okay.

11        And is there any written statement given by Mr. Ward?

12   A    There is not a written statement by Mr. Ward.

13   Q    Are there any sworn statements given by Mr. Ward?

14   A    There is not.

15        **MR. CRANE:**  Just one moment please.

16        **THE COURT:**  Yes, sir.

17        (Pause in proceeding.)

18   **BY MR. CRANE:**

19   Q    Ma'am, you indicated that you believe that this conspiracy

20   might've started in 2017 but yet he becomes involved in 2019?

21   A    We started to learn of Mr. Ward in 2019, correct.

22   Q    Do you have any evidence that he was involved from 2017 to

23   2019?

24   A    I do not have any evidence right now that he was involved.

25   Q    Was the conspiracy going from 2017 to 2019?

Rosalie Herberger - Cross-Examination by Mr. Crane                    41

1    **A**    It was. We have other individuals who were tied into the
2    conspiracy that began in 2017.

3    **Q**    There were other individuals that what?

4    **A**    There were other individuals within the conspiracy that
5    began the conspiracy in 2017.

6    **Q**    Others that began the conspiracy ---

7    **A**    Correct.

8    **Q**    --- but not him?

9    **A**    To my knowledge, he didn't -- I did not know of him in
10   2017, no.

11   **Q**    You're comfortable saying he didn't start the conspiracy
12   or start in the conspiracy until June 2019; is that correct?

13   **A**    I'm saying a few months -- I'm saying in 2019 is when
14   we've got statements on him.

15   **Q**    Okay.

16        Do you know who it was that was brought into this alleged
17   conspiracy in 2017 and '18?

18   **A**    Do I know who the head was running the conspiracy?

19   **Q**    Yes.

20   **A**    I do not.

21   **Q**    Okay.

22        But it wasn't Mr. Ward?

23   **A**    To my knowledge, it was not.

24   **Q**    Okay.

25        (Pause in proceeding.)

Rosalie Herberger - Redirect Examination by Ms. Hinton                42

```
1              MR. CRANE:  Okay.

2         Thank you, Judge.

3         Thank you, ma'am.

4         THE COURT:  All right.

5         Yes, sir.

6         Any follow-up?

7              MS. HINTON:  Just very briefly, Your Honor.

8         THE COURT:  Yes, ma'am.

9                      REDIRECT EXAMINATION

10   BY MS. HINTON:

11   Q    We've referenced "Green cards," is that a Green Dot card?

12   A    That is.

13   Q    Okay.

14        And I think your testimony is that is how payment was

15   getting to Mr. Ward while he was incarcerated; is that correct?

16   A    Correct.

17   Q    In your investigation into this group, was that a common

18   way for Mr. Ward and others within SCDC to obtain money for the

19   drug trade?

20   A    Yes, it is.

21              MR. CRANE:  That's all I have.

22         THE COURT:  Okay.

23         Let me ask you this ---

24         THE WITNESS:  Yes, sir.

25              THE COURT:  --- you've given testimony about different
```

Rosalie Herberger - Redirect Examination by Ms. Hinton                    43

1  transactions that occurred and I understand those took place in

2  Lexington or Richland area, but this case is here in

3  Greenville. Can you describe what the tie is to Greenville?

4          THE WITNESS:  So Mr. Ward is connected to Mr. Edward

5  Akridge, which is G9, in Greenville and we've got an ongoing

6  investigation with some other defendants that we believe they

7  are all tied together. And Mr. Ward and Mr. Akridge had worked

8  together to traffic methamphetamine.

9          THE COURT:  Okay.

10         MS. HINTON:  And Your Honor, may I add something -- a

11  question to that ---

12         THE COURT:  Sure.

13         MS. HINTON:  --- to further tie it up here?

14  BY MS. HINTON:

15  Q    In addition to that, do we have traffic stops on

16  individuals within this conspiracy up in the Anderson Upstate

17  area?

18  A    We do.

19  Q    Okay.

20       And do we also have seizures of large amounts of

21  methamphetamine from storage units up in this area?

22  A    We do.

23  Q    Okay.

24       And is that all connected back to this Matthew Ward, Eddie

25  Akridge ---

Rosalie Herberger - Recross Examination by Mr. Crane                    44

1  **A**    It is.

2  **Q**    --- group? And based on your investigation, is Mr. Ward

3  helping Mr. Akridge move his methamphetamine?

4  **A**    Yes, 100 percent.

5              **MR. CRANE:**  Judge, let me follow up.

6              **THE COURT:**  Yes, sir.

7                        **RECROSS EXAMINATION**

8  BY MR. CRANE:

9  **Q**    Why? Tell me what information you have. How do you tie

10  Mr. Ward to what's going on in the Upstate?

11  **A**    We've got source statements from cooperating defendants

12  and proffers that say Mr. Ward and Mr. Akridge worked together

13  to move methamphetamine.

14  **Q**    What -- what concrete evidence do you have other than

15  statements from people that have been indicted in this

16  conspiracy? Do you have anything other than statements?

17  **A**    We got statements and we've got the purchase of

18  methamphetamine that we have conducted.

19  **Q**    You have what? Statements and what?

20  **A**    We have statements and purchases of ice that we have

21  conducted.

22  **Q**    I understand that. But did any of those people that you

23  purchased from say it came from Mr. Ward?

24  **A**    That the methamphetamine ---

25  **Q**    Yeah.

Rosalie Herberger - Recross Examination by Mr. Crane                45

1   **A**   --- came from Mr. Ward? The people we purchased from, the

2   people selling the methamphetamine were acting on behalf of

3   Mr. Ward.

4   **Q**   So those -- the people that purchased it said those that

5   sold it to them were acting on behalf of Mr. Ward?

6   **A**   And some of the people who sold it said they were acting

7   on behalf of Mr. Ward.

8   **Q**   All right.

9       You got any cell phone records or text messages going back

10  and forth for those people and Mr. Ward?

11  **A**   Yes.

12  **Q**   You do?

13  **A**   Yes.

14  **Q**   When did you get those?

15  **A**   We've gotten some text messages in August 2019 when we

16  executed the search warrant on Ms. Rooks's house and the

17  storage unit.

18  **Q**   I understand that. I'm talking about the Upstate here. She

19  asked about the Upstate and Anderson County. You got any text

20  messages from people in the Upstate that have been stopped?

21  **A**   Not with Mr. Ward.

22  **Q**   Okay.

23      And -- and the question that slipped my mind: Where is all

24  of this stuff originating from? How does -- if Mr. Ward is

25  involved, how does he arrange for it to come to South Carolina?

Rosalie Herberger - Recross Examination by Mr. Crane                    46

1    **A**    So Mr. Ward uses -- was utilizing a cell phone. And he

2    directs the individual on what occasion to go to to pick up the

3    methamphetamine. The individual acts on Mr. Ward's behalf and

4    picks up the methamphetamine. And then they bring it back to

5    whatever residence or house it's being brought back to to be

6    trafficked.

7    **Q**    I understand that. But someone has to go pick it up. Who

8    arranges for it to go to that spot for someone to pick up?

9    **A**    Mr. Ward is talking to whoever is selling the

10   methamphetamine.

11   **Q**    That's what I'm asking. Who was it that you're saying is

12   selling it?

13   **A**    All we've been told is Mr. Ward is -- it's with the

14   Mexicans.

15   **Q**    Mexicans?

16   **A**    Correct.

17   **Q**    You got any cell records, Facebook, text messages,

18   anything that Mr. Ward is contacting Mexicans to bring dope to

19   South Carolina?

20   **A**    I don't.

21   **Q**    Okay.

22        Thank you.

23            **THE COURT:**  All right.

24            Anything further?

25            **MS. HINTON:**  No, Your Honor.

1           **THE COURT:**  Okay. All right.

2           Thank you, ma'am.

3           **THE WITNESS:**  Thank you.

4           **THE COURT:**  All right.

5           You can call your next witness.

6           **MS. HINTON:**  We don't have any other witnesses,

7     Your Honor. Thank you.

8           **THE COURT:**  Okay.

9           Mr. Crane, do you have any witnesses on the issue of

10    probable cause or detention?

11          **MR. CRANE:**  Judge, I don't have any witnesses. I

12    would like -- you know, I mean,  we could put up him on the

13    stand. But if I might just give a brief statement on the

14    detention.

15          **THE COURT:**  Yes, sir.

16          **MR. CRANE:**  He's been incarcerated since 2012 on

17    various charges. And the thing that concerns him and me,

18    besides the COVID that's rampant in some of the jails, he

19    says -- and the government, I think, can confirm this. He was

20    actually sent to Supermax, as he calls it, within the

21    Department of Corrections in August 2019 at the direction of

22    the federal government, the feds told South Carolina Department

23    of Corrections to put him in Supermax. He went to Supermax.

24          Because of going to Supermax, his original max-out

25    date was July of this year. When he went to Supermax, he no

1   longer gets any credit for time served or work credits or

2   anything like that. So his max-out date was actually moved til

3   November 24, that they've testified to. So he lost -- what is

4   that? -- four months, I guess. Three or four months. He -- he

5   would have already been out had the government not moved him to

6   Supermax.

7           He is currently -- when they picked him up last

8   Wednesday -- and he thinks he -- he thinks he's done with South

9   Carolina. We've gotten on their website and pulled it up while

10  we were sitting in court. It shows that he's released from

11  South Carolina Department of Corrections. Now that might be

12  released to Spartanburg, but it says released. He tells me --

13  Mr. Ward tells me he's finished with South Carolina.

14          **THE COURT:**  So he's served his ---

15          **MR. CRANE:**  He served his ---

16          **THE COURT:**  --- sentence.

17          **MR. CRANE:**  --- time and is done. They signed him out

18  and he's finished. So the only thing that we think is holding

19  him is the federal charges.

20          Now, not only did they take away three or four months

21  of his good time and he had to spend longer in South Carolina

22  Department of Corrections, but having been brought here to

23  Spartanburg, for whatever reason, someone has directed that

24  Spartanburg keep him segregated from everybody. He's in their

25  Supermax over in Spartanburg, if you want to call it Supermax.

1  I don't know what they call it, but we'll call it Supermax.

2          And living over there, he gets showers every three

3  days. He's not allowed to clean his cell. He tells me he's been

4  wearing paper underwear for the last seven days. They won't

5  give him a change of underwear. He's been wearing the same suit

6  since he got there. He can't make a phone call. He can't get

7  writing materials. He can't even contact me if he wanted to do

8  so. He's totally locked down and he can't do anything which, in

9  his opinion and mine too, is a little inhumane. They're not

10  treating him like they should.

11          He wants to get out of there. Of course, he wants a

12  bond. If he is released, he tells me that he would live with

13  his brother that lives in Pelion. I think he told the probation

14  he can live with his mother down there, but he's contacted his

15  brother. His brother works for the brick factory and can get

16  him a job down there.

17          At this point, we're early on in this situation in

18  the case. Like I said, I got the discovery but I've got really

19  a bunch of worthless discovery, too, that I can't do anything

20  with. So I don't know where we're going with this. I've heard

21  what the agent had to say today, but it sounds to me like a

22  bunch of people been arrested that have tried to get out of it

23  by putting him in the middle of it. Now, maybe he's involved;

24  maybe he's not.

25          But I think he's entitled to a bond. We would ask

1    that you give him a bond and let him see if he can get out. If

2    you've got to put him on a monitor, do that. But we need to get

3    him out of where he is right now. Thank you, sir.

4            **THE COURT:**  All right.

5            Anything from the government?

6        **MS. HINTON:**  Yes, Your Honor.

7            I guess, first, as to the preliminary hearing, the

8    government feels as though we have presented ample evidence

9    that probable cause existed that Mr. Ward was involved in this

10   conspiracy and the distribution of methamphetamine as alleged

11   in the complaint. If Your Honor wants further argument on that,

12   I'm happy to --

13           **THE COURT:**  No. I agree with that.

14           The testimony that's been presented shows, at least

15   from a probable cause standpoint, that the crimes alleged were

16   committed and that Mr. Ward committed them.

17           So on the issue of detention.

18       **MS. HINTON:**  Thank you, Your Honor.

19           As Your Honor is aware this carries a presumption of

20   detention, as he is looking at a minimum 10 years and a maximum

21   of life imprisonment. I'm not sure, respectfully, that any of

22   the arguments that Mr. Crane just made related at all to the

23   factors to be considered regarding bond.

24           He does talk about how this case relies entirely on

25   statements of people who were trying to get out of jail or

1   assert their own position. But that is not what the testimony

2   was. In fact, many of the things that the government alleges

3   was corroborated by Mr. Ward in his statement to the FBI on the

4   date that he was transported.

5          Mr. Ward acknowledges that he is a member of Folk

6   Nation. He acknowledges that he is a gang member. He

7   acknowledges that he would introduce people who wanted to sell

8   methamphetamine to people who were holding weight. That is

9   being part of this conspiracy. He admitted to sending Mr. Aaron

10  Carrion to collect money from Brian Bruce. So we know that

11  money is getting back to Mr. Ward somehow. If he is sending

12  someone to collect on his behalf, we know that money is getting

13  to him while he is in SCDC.

14         Further, we know that Mr. Ward made at least, a

15  veiled threat to people within this conspiracy that he refers

16  to as snitches. And when confronted about that threat and the

17  fact that that would be taken seriously and he could be facing

18  additional time, Mr. Ward blows that off by saying, "I'm

19  looking at 20 to 30, what's another 10 to 20 on top of that?"

20         He also admits to being connected to "G9" and "Man

21  Man," who the government knows to be Eddie Akridge and James

22  Peterson who are -- in addition to serving other state

23  sentences, have pending warrants for murder that they conducted

24  inside SCDC. Mr. Ward also admitted to being involved in the

25  sale of firearms. So while we do have cooperator statements, we

Arguments of Counsel                                              52

1    also have Mr. Ward's own statement that the government can rely

2    on.

3            Your Honor, the evidence shows that Mr. Ward is the

4    head of a violent gang over the Columbia and Lexington area.

5    And as Agent Herberger testified, some of the conspirators in

6    that case have also been arrested on the here, some of the

7    conspirators in our own case now, for sales of methamphetamine

8    up in the Upstate area.

9            Your Honor, we know that a violent -- at least one

10   violent act has occurred. While Mr. Ward denies that he told

11   Mr. Carrion to beat up Mr. Bruce, the testimony of Agent

12   Herberger that -- was that we have several sources that say

13   that Mr. Ward did that. We also know that Mr. Bruce was beat so

14   severely that they thought that he was shot by a gun in the

15   face.

16           Your Honor, he is moving, in one year, 49 kilos and

17   nine firearms. That is a substantial amount of methamphetamine.

18   We know that he was moving weight because of the texts and the

19   calls that we have. And that is corroborated by the fact on

20   August 23, 2019, when his cell was tossed by the Department of

21   Corrections, Mr. Ward was found to be on the phone, physically

22   on the phone that the CIA had been contacting him on.

23           Your Honor, he is the head of this conspiracy. And

24   all told, we have almost 50 kilos and 116 firearms in this

25   conspiracy. This is a massive drug and firearm conspiracy. He

Ruling of the Court                                                    53

1   coordinated all of this while inside the Department of

2   Corrections. I can only imagine what Mr. Ward would be able to

3   coordinate if he was allowed free rein to do whatever he

4   wanted. He has 18 violations while incarcerated, including

5   escape, which I think weighs heavily on the fact that he is not

6   a candidate for bond.

7           Further, Your Honor, in the pretrial services report,

8   they were unable to verify any family history or any address,

9   which is certainly a concern of the government.

10          So Your Honor, based on all of these factors and the

11  testimony by Agent Herberger, the government believes under

12  18 U.S.C. 3142 that there is no condition or combination of

13  conditions that would reasonably assure his presence and that

14  would reasonably protect the community and the cooperators

15  within this case based on Mr. Ward's own statements. Thank you,

16  Your Honor.

17          **THE COURT:**  All right.

18          Thank you.

19          All right.

20          I'm going to enter an order of detention. I find that

21  the weight of the evidence against Mr. Ward is strong. He's

22  subject to a lengthy period of incarceration if convicted. He

23  has a serious prior criminal history which does include acts of

24  violence. It appears that from the government's testimony that

25  he was participating in criminal activity while in custody at a

1   -- on a fairly massive scale. And for those reasons, I'm going

2   to enter an order of detention.

3           I would ask the -- some of the concerns that

4   Mr. Crane raised regarding Mr. Ward's conditions while at the

5   jail, I'm going to ask the marshals just to look into those. Of

6   course, those aren't necessarily relevant to a detention issue,

7   but it does suggest a Fourteenth Amendment or an Eighth

8   Amendment concern, and I'd ask that you look into those.

9           All right.

10          Anything further?

11          **MS. HINTON:**  Not from the government, Your Honor.

12          **THE COURT:**  Okay. All right.

13          Thank you, sir.

14          **MR. CRANE:**  Judge?

15          **THE COURT:**  Yes, sir.

16          **MR. CRANE:**  You didn't ask me if there was anything.

17          **THE COURT:**  I'm sorry? Oh, I'm sorry. Anything

18  further?

19          **MR. CRANE:**  I understand what you ruled about the

20  witness statements and so forth, but I would, in fact, ask the

21  Court -- for example, I'd like to get a copy of that alleged

22  tape recording of the trip from Columbia to here.

23          **THE COURT:**  I understand. But that's not an issue for

24  today. I fully expect that the government is going to provide

25  discovery as they should, as they are required to do. But I'm

1  not going to tell them that they need to give that to you

2  today. I am directing them to comply with the rules of

3  discovery and turn over information to Mr. Crane as is

4  appropriate.

5         And Mr. Crane, if you're dissatisfied with the

6  information that's provided, that it's redacted, or something

7  you feel like you need more information, we can take that up.

8         **MR. CRANE:**  I appreciate that. The only reason I

9  thought it was relevant is because my client -- when the agent

10  was saying he said this, he said he didn't say any of that

11  stuff.

12        **THE COURT:**  I -- I understand. And I -- even setting

13  that aside, my ruling is based on the information I've heard --

14        **MR. CRANE:**  Oh, I understand.

15        **THE COURT:**  -- information which includes copies of

16  text messages that he sent from jail that the government has

17  where they were directing these -- these transactions. While he

18  says that he doesn't say certain things, there are many

19  co-conspirators who do attribute his criminal conduct as part

20  of this conspiracy.

21        **MR. CRANE:**  No. I'm talking about the trip from

22  Columbia to Spartanburg where she said the agents had a tape

23  recorder of him admitting to this. He said he didn't do --

24  admit to any of that.

25        **THE COURT:**  Okay.

56

1          Well, what I heard was that the recording was half

2    completed, that the battery had died midway through, but

3    whatever is presented and relied upon, and the government has

4    relied upon that here, that should be turned over. And I'm --

5    I'm -- fully expect that the government to do that.

6          **MR. CRANE:**  Thank you, Judge.

7          **THE COURT:**  All right. Okay.

8          Anything further, Mr. Crane?

9          **MR. CRANE:**  Nothing further.

10         **THE COURT:**  All right.

11         Thank you very much.

12      (The Court adjourns at 11:42 a.m.)

13

14                    * * * * * * * *

15              **C E R T I F I C A T E**

16      I certify that the foregoing is a correct transcript from

17    the record of proceedings in the above-entitled matter.

18

19    _____                    ___June 21, 2021___

20    Teresa B. Johnson, CVR-M-CM, RVR, RVR-M              Date

21

22

23

24

25

**I N D E X**

DESCRIPTION                                        PAGE NO.

**Witnesses for the Government:**

Rosalie Herberger

     Direct Examination by Ms. Hinton                    3

     Cross-Examination by Mr. Crane                     27

     Redirect Examination by Ms. Hinton                 42

     Recross Examination by Mr. Crane                   44

Argument of Counsel                                    47

Ruling of the Court                                    53

**E X H I B I T S**

| **NO.** | | **ID** | **EV** |
|---|---|---|---|
| **GOVERNMENT** | | | |
| No exhibits offered. | | | |
| **DEFENSE** | | | |
| No exhibits offered. | | | |
| **COURT** | | | |
| No exhibits offered. | | | |